UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
JUAN NICOLAS ORDENES,                           :
                                                :
                   Petitioner,                  :
                                                :          05 CIV 8968  (HB)
              -against-                          :
                                                :          OPINION&
UNITED STATES OF AMERICA                         :            ORDER
                                                :
                   Respondent.                  :
------------------------------------------------------------------------x

Hon. HAROLD BAER, JR., District Judge:

On October 6, 2005, I sentenced petitioner Juan Nicolas Ordenes ("Ordenes") to 151 months imprisonment.  On October 18, 2005, Ordenes filed this petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2255.  Ordenes seeks to vacate his sentence on the ground that his retained attorney rendered to him ineffective assistance of counsel.

For the following reasons, Ordenes' petition is DENIED.[1]

## I.      BACKGROUND

### A.   Underlying Facts of Ordenes' Conviction

On May 2, 2005, a jury convicted Juan Nicolas Ordenes ("Ordenes") of conspiring to distribute and possessing with intent to distribute five or more kilograms of cocaine in violation of 21 U.S.C. §§ 812, 841, 846.  See generally 11/29/06 Government's Post-Hearing Memorandum in Opposition to Habeas Petition of Juan Nicolas Ordenes ("Gov't Mem.") at 2.  At trial, much of the evidence came from the testimony of Jesus Dominguez, who chose to cooperate with the U.S. Attorney.

The Government established that Juan Garcia, the leader of an international narcotics trafficking organization, approached Jesus Dominguez to form a trucking company called "J&M Express."  Tr. 744-46.[2]  Petitioner Ordenes, on behalf of his own trucking company, "Debee Do Trucking," subcontracted with Dominguez to find loads

---

[1] The Court wishes to thank Britt Burner of Brooklyn Law School and Christopher Fitzgerald of CUNY School of Law for their considerable assistance in researching and preparing this Opinion.

[2] Citations to "Tr." refer to the trial transcript.  Citations to "GX" refer to the Government's exhibits admitted at trial.  See United States v. Vazquez et al., 04 Cr. 603 (S.D.N.Y.) (HB).

for Dominguez to drive using a Freightliner owned by J&M Express.  Tr. 748-51, 1457.
In early 2003, Dominguez began to participate in accordance with the agreement.  Tr.
752-53.

In January 2003, Garcia offered Dominguez the opportunity to earn more money
by transporting kilograms of cocaine.  Tr. 753.  The truck was equipped with a hidden
compartment for cocaine storage, designed to remain undetected by routine Department
of Transportation inspections.  Tr. 753-55.  Between January and December 2003,
Dominguez transported over 1,000 kilograms of cocaine and ten to twelve million dollars
across the country for Garcia.  Tr. 756-58.

Dominguez, at Garcia's behest, received the cocaine from a variety of sources,
including some from two girls he met at a restaurant who gave him duffel bags of
cocaine, see Tr. 771-73; some from a home in Rancho Cucamonga, California, see Tr.
784-85; and some from a van loaded with cocaine to which Juan Garcia gave him the
keys.  Tr. 784-85.  Dominguez would then load the cocaine into the truck with the secret
compartment.  Tr. 776-77.

Generally, after loading the truck with cocaine, Dominguez would call Ordenes to
arrange a pickup of legitimate items (such as wood or jacuzzis) for delivery to the East
Coast.  Tr. 776-77.  Dominguez would typically deposit the cocaine in New York or New
Jersey.  If Ordenes gave Dominguez a shipment for delivery to the South or the Midwest,
Dominguez would request a delivery location closer to New York.  Tr. 777-78.

Dominguez made his first trip with cocaine in January 2003.  Tr. 770-71.  Once
Dominguez arrived in New York, he met with a man named "Cali" and exchanged the
cocaine for one million dollars.  Tr. 778-80.  Dominguez placed the money in the hidden
trap and returned to California with a cargo of cars, which he dropped off at a lot owned
by Petitioner Ordenes.  Tr. 780-81.

On December 9, 2003, while on one of these trips, Dominguez was arrested in
Illinois.  Tr. 731.

On January 26, 2004, another truck driver, Cleofas Contreras Vazquez,
transported cocaine for Garcia.  See Government's Trial Exhibits ("GX") 41, GX 42, GX
45, GX 46.  On February 2, 2004, Garcia, in several wiretapped telephone conversations,
described how Vazquez was to pick up a Mitsubishi Montero.  GX 46-50.  During this

time, Garcia and Petitioner Ordenes were taped having a conversation about Vazquez's pickup of the Mitsubishi.  GX 51, GX 53.  Garcia was also overheard during this time having conversations with an associate, Jose Fernando Salinas Garcia, regarding the quality of a previous cocaine shipment and the drug money that Vazquez was on his way to retrieve from the East Coast.  GX 56; Tr. 814-15.

On February 4, 2004, New Jersey State Police Detective Robert Gaugler and two other detectives stopped Vazquez while he was driving a tractor-trailer with the Mitsubishi Montero loaded onto it.  Tr. 106-08, 113-14.  The detectives found $985,000 in cash inside the Mitsubishi.  Tr. 139.

Petitioner Ordenes called Garcia the next morning, February 5, 2004, and asked Garcia to call him back from a different phone.  GX 58.  In the next 20 minutes, Garcia paged Jose Fernando Salinas Garcia twice.  When Jose Fernando Salinas Garcia called Garcia back, Garcia told him "they got that guy with the money."  GX 59-GX 61.

Garcia and Vazquez spoke on the phone approximately 10 times on February 9, 2004, each conversation regarding the police stop in New Jersey and the search of the Mitsubishi.  GX 64-73.  Ultimately, the two agreed that when Vazquez returned, they would have to meet with Garcia's associates to explain what happened at the police stop. GX 71; Tr. 815-17.

On February 9, 2004, Vazquez also telephoned Ordenes regarding the police stop in New Jersey.  GX 75.  Vazquez detailed the events of the police stop and the conversations that had gone on earlier that day between Vazquez and Garcia.  Id. Ordenes expressed an interest in going to the meeting with Garcia's associates and Vazquez replied that it was not necessary because Ordenes had nothing to do with it.  Id. Ordenes disagreed with Vazquez and stated that he was the first to notify Garcia about Vazquez being stopped.  Id.  Vazquez told Ordenes that the money in his truck was not found and that he was not sure if Garcia would make him return the money.  Id.

Beginning on May 16, 2004, Garcia and Jose Fernando Salinas Garcia had conversations regarding the use of Ordenes as a driver for the organization.  GX 78-80, GX 83.  On June 4, 2004, Garcia asked Ordenes to transport loads for him.  Ordenes told Garcia that he did not want to leave until the Department of Transportation stopped conducting random inspections that were occurring at that time.  GX 84.  On June 15,

2004, Ordenes and Garcia discussed whether Ordenes was being surveilled.  GX 85-87.
Ordenes told Garcia that he wanted to work again, and that he did not want any mistakes
like there had previously been.  GX 88.  On June 17, 2004, Garcia told Ordenes about a
Hummer truck that had to be picked up from someone who owed them a debt.  GX 89.
Several conversations over the next few days laid out Ordenes's trip to get the Hummer
in Chicago.  GX 91-93, GX 95-97.  Ordenes met with a man named El Viejo on June 29,
2004, in Chicago, and picked up the Hummer.  Id.  A Hummer was later found near
Garcia's house in a parking lot.  Tr. 527, 555-56; GX 37.

     B.  <u>Counsel's Pre-Trial Representation of Petitioner</u>

     Counsel David Elden ("Elden") represented Petitioner Ordenes throughout
Ordenes' trial.  Elden was introduced to Ordenes by Garcia's counsel, David
Arrendondo.  Hrg. 7-8, 75.[3]  According to Elden, he happened to meet Arrendondo
because both were in magistrate court on the same day.  Hrg. 80.  Arrendondo briefly
described the nature of the case to Elden and explained that the case involved wiretaps.
Hrg. 80.  Ordenes, for his part, alleged that Arrendondo simply told him, Elden "will
represent you."  Ordenes Aff. ¶2.

     It is undisputed that Elden is an experienced criminal defense lawyer.  Elden
testified that all of his cases are criminal, approximately 65% of which have been in the
federal system.  Hrg. 73.  Elden testified that he had been the lead defense attorney in
approximately 70 trials – 25% of those federal criminal trials, and most of those
involving narcotics conspiracies.  Hrg. 6-7.  Elden is currently a member of the board of
directors for the National Association of Criminal Defense Lawyers, has lectured on the
federal sentencing guidelines, and was a past president of the Criminal Courts Bar for
Los Angeles.  Hrg. 72-73.  Elden was exonerated in the only ineffective assistance of
counsel petition in which he was named.  Hrg. 74.  By his own admission, however,
Elden is not experienced in Second Circuit caselaw.  12/13/05 Aff. of David A. Elden,
("Elden Aff.") ¶1.

     Elden, Ordenes, and Ordenes' wife Debee Ordenes provide vastly conflicting
accounts of Elden's pre-trial representation of Ordenes.

---

[3] Citations to "Hrg." refer to the hearing held in this matter on November 3, 2006.

According to Elden, he first substantively met with Ordenes in the San Bernardino jail, outside of the presence of any others.  Hrg. 78-79, 184-85.[4]  At this meeting, Elden claims that he discussed with Ordenes, among other things, the indictment, the necessity for a wiretap suppression motion, and issues related to sentencing such as the possibility of a ten-year mandatory minimum sentence, the "safety valve" (i.e. the only way that Ordenes could receive less than the mandatory minimum),[5] downward departures, and that sentencing ranges were ultimately at the Judge's discretion based on evidence put forth at trial.  Elden Aff. ¶2, 12.  Elden, according to him, also explained to Ordenes conspiracy law, including the different methods of proving that one is a member of a conspiracy.  Id. at ¶11.[6]  Elden testified that he and Ordenes discussed the method for calculating the quantity of narcotics for which Ordenes could be held accountable for.  Hrg. 15-16.  They discussed Elden's $10,000 fee for representation at the bail hearing, which was the only thing Elden was retained for at the time.  Hrg. 79-81.  Ordenes, according to Elden, told Elden about his criminal history and work background in preparation for the bail hearing.  Hrg. 82.

Ordenes, on his part, contends generally that these topics were not discussed at this meeting, nor at any subsequent pre-trial meetings.  Ordenes Aff. ¶10.[7]  Debee Ordenes generally agreed.  Hrg. 151, 166.[8]  Ordenes also claims that Elden never

---

[4] Debee Ordenes generally claims that she was at every meeting that took place between her husband and Elden.  However, it became clear on cross-examination of her that this meeting took place outside her presence.  Hrg. 78-79, 184-85.

[5] In certain situations, a defendant may qualify for a "safety valve" exception to the mandatory minimum sentence.  See 18 U.S.C. § 3553(f) (listing factors to qualify for "safety valve").

[6] Elden testified that he "indicated what a conspiracy was, that it was an agreement between two or more persons to do an illegal act… [that it] didn't have to be in writing… [that it] had to be in some type of an overt act in furtherance of a conspiracy."  Hrg. 13.

[7] "During the 'pre-trial' meetings with Mr. Elden he: never defined or explained federal narcotics conspiracy law… never informed me that I faced a ten (10) year mandatory minimum sentence if convicted; never explained the concept of "safety valve;" never explained the option of cooperation, nor how cooperation worked; never explained how the Sentencing Guidelines would impact upon my case if I was convicted or if I pled guilty; never did any type of Guideline calculation…"  Ordenes Aff. ¶10.

[8] For example, Debee Ordenes testified:

"Q:  … Prior to coming to New York, had Elden ever described to Juan in your presence how the quantity of narcotics could be determined for the purposes of a conspiracy charge?

A:  No.

Q:  Did he ever define or explain exactly what a conspiracy is and what is needed to prove membership in a conspiracy?

A:  No.

explained federal narcotics conspiracy law; his options to cooperate or plead guilty, nor the likelihood that the government would want to use a cooperating witness; nor the pros and cons of the option to testify on his own behalf, including that by virtue of his testimony, he could be found to have obstructed justice, which could result in an enhanced offense level.[9]  Ordenes Aff. ¶10.  Ordenes and his wife also claim that the "safety-valve" option was never explained to him at this time, and rather, was first discussed the weekend before the verdict in his case.  Ordenes Aff. ¶10; Hrg. 164.

Elden hired John Brown & Associates, a private investigation firm, to assist in preparation for the bail hearing.  Elden Aff. ¶2.  According to Debee Ordenes, around this time, Elden called her to set up a meeting to discuss the bail proceedings.  Hrg. 144.  During this meeting, according to Debee, she gave investigators background information about herself, her husband, and her family.  Hrg. 145.  After the investigators concluded their questioning, Elden took her into another room to collect his agreed-upon $10,000 fee.  Id.

Elden filed a motion for bail and represented Ordenes at a contested detention hearing.  Hrg. 82-84.  According to Elden, Ordenes did not testify at this hearing, and a bail package was set.  Hrg. 83.

Elden remembered three separate meetings with Ordenes in his office between the time of Ordenes' release on bail, and Elden's departure for the suppression hearing in New York.[10]  Hrg. 88-89.

Shortly after the bail hearing, Ordenes and his wife met with Elden to discuss whether or not Elden would represent Ordenes going forward.[11]  Hrg. 84-85.  As was his usual practice, Elden claimed that during this meeting, he discussed substantive areas of the case as well as his fee.  Hrg. 19, 85, 97, 119.  Elden claimed that he reiterated topics

---

Q:  What about after coming to New York, at any time did Elden ever discuss or define the ten-year mandatory minimum?

A:  No."

Hrg. 151, 166.

[9] See 18 U.S.C. Appx. § 3C1.1.

[10] The motion to suppress the wiretaps was denied.  Hrg. 91.  At Ordenes's request, Ordenes was excused from attending the suppression hearing in New York because only legal arguments would be advanced.  Hrg. 90-91.

[11] Debee Ordenes, upon reviewing her diaries taken at the time, remembered the date of this meeting as August 26.  Hrg. 148.

discussed at their earlier meeting, including the indictment, conspiracy law, Ordenes'
options, and the Sentencing Guidelines.  Hrg. 19, 85.  Elden did not remember
specifically discussing the constitutional right not to testify.  However, Elden averred that
it has always been his practice to do so with all clients.  Elden Aff. ¶14.  Elden claimed
that during this meeting, Ordenes maintained his innocence, and told him he would not
plead guilty to something he did not do.  Id. at ¶3.[12]  Ordenes alleges this meeting lasted
only a half-hour and they only discussed Elden's fee.  Ordenes Aff. ¶5.  Debee Ordenes
generally supports her husband's account.  Hrg. 148.[13]

During the time following this meeting, Elden was preparing a motion to suppress
the wiretaps.  Hrg. 86-87.  At some point during this time, the Ordenes' received a phone
call from Elden alerting them that the CD recordings of the wiretaps were ready to be
picked up.  When they picked up the CDs, according to Ordenes and Debee, Elden told
them to review the CDs against the transcripts for any discrepancies in the translations.
Ordenes Aff. ¶ 6-7; Hrg. 156, 159.[14] Ordenes and his wife believed that this meeting
lasted only twenty minutes.  Ordenes Aff. ¶7; Hrg. 156.  Debee Ordenes recalled that at
this meeting, Elden requested more money for costs.  Hrg. 156.

According to Elden, at his next meeting with Ordenes, he explained the
suppression motion he had drafted to Ordenes, and Ordenes signed an accompanying
affidavit in support.  Hrg. 88-89.[15]  Elden then traveled to New York to argue the wiretap
suppression motion, which he lost.  Ordenes did not attend.  Hrg. 91.

Ordenes alleged, and Debee Ordenes agreed, that he only had one other meeting
with Elden in Los Angeles, on the Saturday prior to the trial in New York, totaling four
meetings post-bond.  Ordenes Aff. ¶8; Hrg. 147.  Ordenes claimed that at this meeting, he

---

[12] Debee Ordenes, for her part, generally agrees that Ordenes maintained his innocence during this time.
"Q: Do you recall any discussions or statements by your husband to Elden, again, that were a protestation
of his innocence?  A: Yes, always, every time."  Hrg. 157.

[13] For what it is worth, the three princpals disagree on where this meeting took place.  Elden claimed the
meeting took place in his office.  Hrg. 84.  Ordenes claims the meeting took place in Los Angeles.  Ordenes
Aff. ¶ 5.  Debee Ordenes claims this meeting took place in the lawyer's lounge at the courthouse.  Hrg. 148.

[14] Elden claimed that the duration of this meeting was a few minutes.  Id.  Ordenes also described this
meeting as less than one hour long.  Ordenes Aff. ¶6.

[15] Debee Ordenes recalled a separate meeting on September 27 at which Elden met with her and Ordenes
and introduced them to his investigator, who asked them questions about the factual details of the case.
Hrg. 149-50.  Debee described Elden as intermittently present at this meeting.  Id.

It is unclear if this meeting was, in fact, a separate meeting, or if these alleged conversations in fact
occurred at a different aforementioned meeting.

again reviewed the CDs and transcripts with an investigator for five to six hours (although Debee Ordenes claimed this meeting lasted three hours).  Ordenes Aff. ¶8; Hrg. 158.

Elden recalled that he had two or three additional meetings with Ordenes during the one and a half to two months between the suppression hearing and the commencement of trial.[16]  Hrg. 91-93.  During these meetings, according to Elden, he and Ordenes reviewed the transcripts with the investigator.[17]  Id.

In addition, Elden contended that during these meetings, he tried to persuade Ordenes to plead guilty because of certain damaging wiretap conversations.  Hrg. 94. Elden testified that he explained to Ordenes that the evidence against him was strong, and that "there is a very good likelihood that he would be convicted."  Hrg. 49, 69.  Ordenes, according to Elden, continued to state that he was innocent, and that he had no knowledge of the conspiracy prior to the seizure of the money that led to his arrest. Elden Aff. ¶13.  Elden stated he had no reason not to believe Ordenes as he continually maintained his innocence.[18]  See Elden Aff. ¶¶5, 9-10.  Elden believed that Ordenes' explanation of "innocence" was consistent with the fact that Ordenes avoided transporting drugs or money for his co-defendants.  Id. at ¶ 13.  Elden also observed Ordenes' financial problems during this period before trial, and believed that to be consistent with Ordenes' explanation that he did not, in fact, receive money for the transportation of the vehicles.  Id. at ¶ 6.

Thus, according to Elden, because of Ordenes' continued, adamant contention of innocence, he did not force issues of cooperation or plea bargaining upon Ordenes.  Elden Aff. ¶10.  Indeed, Elden claimed that each time he brought up the issue of a plea, Ordenes rejected the idea and stated that he would not plead guilty for a crime he did not commit.

---

[16] Elden remembered Debee coming with Ordenes to these meetings, but did not remember if she was substantively involved.  Hrg. 93.

[17] According to Elden, the investigator that Ordenes referred to was hired for his Spanish speaking skills to assist in trial preparation.  Elden Aff. ¶7.  This investigator was extremely familiar with the case and the transcripts.  Id.  Elden worked closely with him, informing him of the issues in the taped conversations that were the biggest concern.  Id.  The investigator was well versed in these issues and was asked to review them with Ordenes.  Id.

[18] Indeed, according to Elden, Ordenes claimed that he was completely unaware that his vehicle was being used as a means of transporting narcotics proceeds; that he never discussed narcotics or the financial proceeds of narcotics transactions with his co-defendant, and that he never assisted anybody in any criminal activity.  Elden Aff. ¶ 9.

Id. at ¶9.  Elden stated that he believed forcing these issues would damage their attorney-client relationship.  Id. at ¶10.

Elden stated that Ordenes told him that he continued to cooperate with his co-defendants after the seizure of money because his co-defendants threatened Ordenes and his family.  Elden Aff. at ¶13. According to Elden, he was aware that a "coercion and duress" defense could not legally be raised on these facts.  Id.  Still, if Ordenes went to trial, Elden felt he had to offer some explanation for Ordenes' involvement with his co-defendants.  Id.  Ordenes, for his part, alleges without explanation that Elden simply told him that his defense was one of "coercion or duress."  Ordenes Aff. ¶10.

Ordenes also generally claims that Elden never gave him his opinion as to Ordenes' chances of success at trial.  Ordenes Aff. ¶13.  Debee Ordenes generally supported her husband's version of events, stating that Elden never discussed the option of cooperation, nor gave the Ordenes' his best informed opinion on whether he should pursue a negotiated plea rather than taking the case to trial.  Hrg. 169-170.[19]

Elden claimed that he made several attempts to set up meetings with Ordenes to prepare for trial, but Ordenes was unable to meet because he had to work.  Elden Aff. ¶6.  After Ordenes rejected his offer to meet on the weekends, Elden continued to prepare for trial without Ordenes' presence.  Id.

C.  Counsel's Representation of Petitioner at Trial

The Government not surprisingly contends that Elden prepared conscientiously for trial.  Gov't Mem. at 24, citing Hrg. 106-107.  In advance of trial, Elden filed at least two motions in limine, one to exclude evidence of a portion of a wiretap call, and another to introduce into evidence wiretap conversations that the government did not intend to introduce.  Hrg. 103.  Elden also filed proposed voir dire questions and requests for jury instructions.  Id.  Trial lasted approximately two weeks.

---

[19] Debee Ordenes testified that generally, throughout trial, Ordenes and her were under the impression that the charges against Ordenes were for handling drugs or proceeds.  Hrg. 169.  She testified that Elden never attempted to disabuse them of this notion.  Id.  She testified that during the trial, she asked Elden of their chances of prevailing.  Elden told her that "he had been a lawyer long enough not to guess."  Id.  According to her, Elden led her and Ordenes to believe that he would be acquitted.  Debee stated, "We didn't believe that he would have been convicted. We trusted him. He was the attorney. He's supposed to be on our side." Hrg. 189.  Debee also testified that she did not ask questions about how much jail time her husband was facing.  Id.

i.      _Ordenes' Decision to Testify_

Ordenes ultimately testified in his own defense at trial.  Elden stated that he advised Ordenes that the recordings of wiretapped conversations "need[ed] to be rebutted and [Ordenes'] position need[ed] to be explained," and if Ordenes did not testify, there would "be no way for anybody to make any argument in his behalf."  Hrg. 107.  Elden testified that he posed the decision to testify as Ordenes' to make, while at the same time advising him that it was his only chance to win.  Id.  Elden testified that he discussed with Ordenes how his testimony could affect his sentence, specifically how obstruction of justice, if found, might enhance his sentence and potentially block his eligibility for "safety-valve" treatment.  Gov't Mem. at 27, citing Hrg. 44, 108, 110.   Throughout these discussions, Elden reiterated that he recommended to Ordenes to change his plea to guilty.  Hrg. 110.

Ordenes, on his part, claims that he met with Elden for about 2 hours on the first day of trial, at which point in time Elden told him, "I'm going to put you on the stand." Ordenes Aff. ¶ 11.  According to Ordenes, this was the first time he discussed with Elden the possibility of testifying at trial.  Id.

Elden concedes that he did not recall directly advising his client of his Constitutional right not to testify.  Elden Aff. ¶ 14.  However, on five separate occasions at trial, discussion took place in open court directly concerning whether or not Ordenes or his co-defendants would testify.  According to the Government (and uncontradicted by Ordenes), Ordenes did not express surprise or have any other reaction to these discussions.  Gov't Mem. at 27-28; Hrg. 113-114.[20]

---

[20] These five occasions are 1) the Court's instruction to the jury during _voir dire_ that defendants "don't have [to] say a word or have a moment of testimony or evidence that they present," see Gov't Mem. at 28, citing Hrg. 110-111, Government's Exhibit at 11/03/06 Post-Trial Hearing ("HGX") 3; 2) the instructions to the jury after the Government concluded its case that defendants may "choose to mount a defense," see Hrg. 111; 3) co-defendant Ernesto Garcia's counsel's response to the Court's question as to whether Garcia would testify that it was "his decision" and that Garcia had the "last option," see Hrg. 112; 4) the Court's statement to Elden that there was no understanding as to whether Ordenes would testify; see Hrg. 113; and 5) the Court's instructions to the jury that "[i]n a criminal case the defendants cannot be required to testify." Hrg. 113-114.

ii.     _Counsel's Preparation for Trial and for Ordenes' Testimony_

Both Elden and Ordenes agree that the actual preparation for petitioner's testimony began after the commencement of trial.  See 11/29/06 Petitioner's Brief at 22, citing Hrg. 65.  Their characterizations of the extent of that preparation are, unsurprisingly, different.

Elden claims that during the trial, he met with Ordenes two to three days per week after court and on the weekends.[21]  Elden Aff. ¶8.  During these meetings, Elden maintains that he prepared his client to testify by reviewing transcripts and making an outline for Ordenes' testimony.  Hrg. 66.  Specifically, Elden states that Ordenes and he spent between 15 and 20 hours in preparation for Ordenes' testimony. Elden Aff. ¶8.  Elden recalls that the weekend before Ordenes took the stand, they did a "dry run" of the testimony.  Hrg. 67.[22]

Ordenes claims that he met with Elden a total of 2 to 3 times after the commencement of the trial.  Ordenes Aff. ¶9.  Regarding his testimony, Ordenes states that he prepared for approximately one and a half hours with Elden the night before he testified, when he reviewed some of the questions that might be asked.  Ordenes Aff. ¶8.  Debee Ordenes, for her part, claims that Elden simply directed Ordenes to memorize the transcripts of the wiretapped phone calls.  Hrg. 187-188.  Debee testified that no "moot court" format was used, nor was there any review of the questions that would be asked while petitioner was on the stand.  Id.

iii.     _Ordenes' Testimony at Trial_

At trial, Ordenes testified that indeed, on February 5, 2004, he had a conversation with Vasquez from which he got the impression that he "could be in trouble."  Tr. 1476.  He telephoned Juan Garcia and asked that Garcia call him from another phone.  Id.  Ordenes testified that he asked Juan Garcia about the "money that they found in the

---

[21] "While in New York for the trial, Mr. Ordenes and I met two to three days per week, after court sessions, for the approximately two week duration of the trail…These meetings lasted one to two ours during trial days, and six to seven hours per day on the weekend."  Id.

[22] Elden also recalled that Debee Ordenes was present at most of these meetings between him and Ordenes.  However, at times Debee was working in an adjacent conference rooms preparing exhibits, and was not present for all the conversations between himself and Ordenes.  Hrg. 67, 105-106.

Mitsubishi." Tr. 1477.  Garcia informed him that it was for land or a house that Garcia had sold in California.  Ordenes testified that he did not believe Garcia.  Tr. 1478.

The next day, when Ordenes returned home to California, Ordenes testified that Juan Garcia was waiting for him in his yard.  Tr. 1479.  Then, Ordenes testified, from their resulting conversation, he became aware for the first time that Juan Garcia and Jesse Dominguez had been involved in drug trafficking.  Id.  Ordenes further testified that this conversation made him feel worried, nervous and scared, particularly as to Garcia's insistence that there be some kind of proof that the money was taken.  Tr. 1480. Generally, throughout these dealings with Juan Garcia, Ordenes testified that that he was merely placating Garcia out of fear for himself and his family.  Gov't Mem. at 12, citing Tr. 1488-1499.

At one point during Ordenes' direct testimony, Elden's questions were objected to as leading.  See generally Gov't Mem. at 29, citing Hrg. 117.  The Court itself asked several questions of Ordenes.  Elden admitted that he asked leading questions, and described it as necessary, given his client's nervousness, to bring his story out to the jury.[23]  Hrg. 117.

Ordenes also called several character witnesses on his behalf, including his wife Debee, his daughter Jeanette; James C. Taylor, his wife's uncle; and Miguel Osorio, a former driver for Ordenes. Gov't Mem. at 13.

### iv.    The "Coercion" or "Duress" Defense

Elden testified that he did not proceed to trial with the intention of mounting a "coercion" or "duress" affirmative defense.  Hrg. 96, 102.[24]  Because, as Elden put it, it was "black letter law wherever you go" that to mount a "coercion" or "duress" defense, a defendant must have no reasonable opportunity to escape, Elden believed that he would

---

[23] "…I felt it was better to get that evidence out and take the hit for leading him."  Hrg. 117.  "Q: Did you feel you were going to need to lead him through his direct examination before he even took the stand? A: Pretty much."  Id.

[24] Nor, Elden added, was it his intention to attempt jury nullification.  Hrg. 102-03.

not be able to put such an instruction to the jury in this case.[25]  Elden accordingly did not explain to Ordenes each of the criteria for a "coercion or duress" defense.[26]  Hrg. 95.

Rather, Elden's strategy at trial, as he described it, was to negate the intent element of a conspiracy charge by arguing that Ordenes never voluntarily joined the conspiracy and that the actions he took were not in furtherance of the conspiracy.  Hrg. 96-97.  Elden testified that because of Ordenes' insistence on going to trial, "this was the only defense that we ha[d]."[27]  Id.

Elden's actions at trial were consistent with his ostensible "state of mind" defense.  During trial, at one point, the Government attempted to prevent the admission of evidence showing petitioner's fear of his co-defendants.  Hrg. 102.  Elden stated to the Court that he was trying to establish his client's state of mind, rather than a "coercion" or "duress" defense.  Hrg. 101-02.[28]

During his summation, Elden attacked the intent prong of the conspiracy charge.  Elden did not mention "coercion" or "duress."  Rather, Elden focused on the language of the conspiracy jury instructions that the jury must find the defendant "took the actions in question deliberately and voluntarily."  Tr. 1717; Hrg. 100; HGX 6.  Elden also pointed out that the instructions required that the "defendant participated in the conspiracy with knowledge of its unlawful purposes and with an intent to aid in the accomplishment of its unlawful objectives…[and] for the purpose of furthering an illegal undertaking."  Hrg. 100.

---

[25] Indeed, Elden admitted that he did not research whether he could pursue a "coercion" or "duress" instruction, because he was "positive" that he would not be successful.  Hrg. 102.

[26] Elden, at the post-petition hearing, was asked, "Now, you never explained this difference to Ordenes that you had drawn in your own mind between the defense of coercion and duress and how you expected to use it or his fear, I should say, how you expected to use his fear as a defense. You never broke it down for him in that form, did you?"  Elden responded, "No. I didn't think that he had a coercion defense, so I never really went through [it]."  Hrg. 34-35.

Elden testified generally that it was not his practice to explain to his clients what all the legal defenses were and whether or not they applied.  Hrg. 95-96.

[27] "Mr. Ordenes simply would not accept that his continued dealings with the co-defendant could legally be viewed as joining the conspiracy."  Elden Aff. ¶13.

[28] During Ordenes' direct testimony, upon the Government's objections, the Court instructed the jury at one point: "…There is a defense in the law called 'coercion,' but for any number of reasons which we don't have to go into, while some of these questions Mr. Elden is asking border on that defense and at the same time on Mr. Ordenes' story, there is no defense in this case of coercion."  Tr. 1482.

At the close of trial, Elden submitted two proposed jury instructions relating to his ostensible "state of mind" defense, deriving from Supreme Court and Second Circuit law regarding "willful" participation in a conspiracy. Hrg. 98-100; Tr. 1717, 1719. Neither of the instructions were ultimately given to the jury. Gov't Mem. 31.

           *v.*     *Post-Trial Activity*

The jury subsequently convicted Ordenes. The Presentence Investigation Report ("PSR"), dated July 27, 2005, concluded that Ordenes' base offense level was 38, because the instant offense involved more than 150 kilograms of cocaine, resulting in a corresponding Guidelines range of 235 to 292 months. Gov't Mem. at 14, citing PSR ¶ 26, 72. The PSR deferred to the Court's judgment regarding application of a two-level obstruction of justice enhancement. See id., citing PSR ¶30.

This Court found Ordenes' offense level to be 34. I sentenced him to 151 months imprisonment; a five year term of supervised release; and a mandatory $100 special assessment. I did not impose the two-point obstruction of justice enhancement. See Gov't Mem. at 15.

D.  Petitioner's Claims for Habeas Corpus

Ordenes brought this petition for *habeas corpus* on October 18, 2005, pursuant to 28 USC §2255.[29] Ordenes alleges that he was deprived of his right to effective assistance of counsel under the Sixth Amendment. See Strickland v. Washington, 466 U.S. 668, 687-96 (1984). Essentially, Ordenes claims not that he was innocent – but that his counsel's failure to provide effective assistance of counsel, given the evidence against him, resulted in a longer sentence than he would have received had he pled guilty and/or cooperated.

Ordenes' claims fall into four general categories.

First, Ordenes claims that Elden failed to explain the relevant law to him, including the elements of the law of conspiracy; the requirements of the coercion or duress defenses; the applicable mandatory minimums, and ways to avoid those, including cooperation and the "safety valve"; the functioning of the Guidelines and the sentencing

---

[29] Ordenes originally filed a timely notice of appeal, but moved to withdraw that appeal on November 19, 2005, in light of this § 2255 petition. The Second Circuit granted Ordenes' motion to withdraw his appeal on December 5, 2005.

table; various possible Guideline calculations; and Ordenes' right not to testify, including the ramifications of testifying, such as an obstruction of justice enhancement. Had Elden adequately explained these concepts to him, Ordenes implies, he never would have maintained his "innocence," and instead would have pled guilty or sought to cooperate with the government in an effort to obtain a reduced sentence.

Secondly, Ordenes claims that Elden failed to adequately prepare him for trial, particularly in that he failed to prepare Ordenes to testify in his own defense.

Third, Ordenes claims that Elden did, in fact, fail to initiate plea negotiations with the government.

Lastly, Ordenes claims that Elden failed to adequately know the law of conspiracy, leading him to pursue a "coercion" or "duress" defense at trial that was legally unavailable and provided no hope for Ordenes to avoid conviction.

## II.      STANDARD OF REVIEW

In order to prevail here under 28 U.S.C. § 2255, a petitioner must show either that 1) his sentence was imposed in violation of the Constitution or laws of the United States; 2) the court was without jurisdiction to impose the sentence it imposed; or 3) the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack. See Woodard v. United States, 2005 U.S. Dist. LEXIS 26802, at *6 (S.D.N.Y. Nov. 8, 2005) (Baer, J.), citing Johnson v. United States, 313 F.3d 815, 817 (2d Cir. 2002); 28 U.S.C. § 2255.

## III.      DISCUSSION

A claim of ineffective assistance of counsel under the Sixth Amendment must satisfy the two-pronged test articulated in Strickland v. Washington, 466 U.S. 668 (1984). A petitioner must affirmatively show that counsel's performance fell below an objectively reasonable standard of performance, and that that deficient performance prejudiced the outcome of the proceeding. See Woodard v. United States, 2005 U.S. Dist. LEXIS 26802, at *8, citing United States v. Aguirre, 912 F.2d 555, 560 (2d Cir. 1990).

Regarding the "performance" prong, this Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." See Griffith v. United States, 2005 U.S. Dist. LEXIS 22545, at *15,

(S.D.N.Y. Oct. 6, 2005) (Baer, J.), <u>citing</u> <u>Aguirre</u>, 912 F.2d at 560; <u>Strickland</u>, 466 U.S. at 689.

Regarding the "prejudice" prong, prejudice is shown if, but for the deficient performance, there is a "reasonable probability" that the outcome of the proceeding would have been different.  <u>Woodard</u> at *9, <u>citing</u> <u>Smith v. Murray</u>, 477 U.S. 527, 534 (1986).  A reasonable probability is a probability "sufficient to undermine confidence in the outcome."  <u>Smith v. Murray</u>, 477 U.S. at 534; <u>see also</u> <u>Aguirre,</u> 912 F.2d at 561 ("The court's central concern is... discerning ... [whether] the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.").

A court need not address both prongs if a petitioner fails to make a sufficient showing on one.  <u>See</u>, <u>e.g.</u>, <u>Bridges v. United States</u>, 2005 U.S. Dist. LEXIS 15401, at *10 (S.D.N.Y. Aug. 1, 2005) (Baer, J.), <u>citing</u> <u>Kanani v. Phillips</u>, 2004 U.S. Dist. LEXIS 20444, 2004 WL 2296128, at *26 (S.D.N.Y. Oct. 13, 2004).

A.  <u>Counsel's Alleged Failure to Explain the Law</u>

Ordenes essentially claims that Elden provided ineffective assistance of counsel by failing to explain to him many of the issues relevant to his defense, including the indictment, federal narcotics conspiracy law, the 10-year mandatory minimum sentence, possible sentencing exposure to be faced if convicted upon trial, the Sentencing Guidelines, the option of cooperation, the safety-valve benefit, the benefits of a negotiated plea agreement, and the possibility of a cooperating witness testifying against him at trial.  Ordenes generally alleges that but for these failures to adequately explain the law to him, he would have "faced the music," pled guilty, and received a lesser sentence.

Elden, however, contradicts all of Ordenes' allegations.  For example, Elden states that he discussed the indictment with Ordenes on at least two occasions, including their meeting at the San Bernardino County Jail, and the first meeting post-bail at which the Ordenes' discussed whether or not to retain Elden for trial.  <u>See</u> Hrg. 14-15, 19.  Elden also stated that they discussed the law relating to conspiracy while Ordenes was still in custody as part of a conversation relating to his bail and the possibility of him being considered a flight risk.  <u>See</u> Elden Aff. ¶11.  Indeed, Elden stated in his affidavit

and at this Court's hearing that he explained to Ordenes each of the above-mentioned concepts on at least one occasion, if not more.  See Elden Aff. ¶¶ 2-3, 10-12, 15.

I find Elden's affidavit and hearing testimony to be more credible than not, particularly in light of the fact that Ordenes' wife's testimony contradicts Ordenes' statements on several points.  Additionally, I am required to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  See Strickland, 466 U.S. at 689.  Given Elden's testimony, Ordenes has failed to meet his burden to establish ineffective assistance of counsel on these grounds, and therefore, there is no need to address the prejudice prong of Strickland.  See, e.g., Bridges v. United States, 2005 U.S. Dist. LEXIS 15401, at *10.

Ordenes' allegation that Elden did not advise him regarding his right not to testify deserves some note.  Generally, defense counsel possesses a duty to explain to the defendant his right to decide whether or not to testify.  See Brown v. Artuz, 124 F.3d 73, 74, 79 (2d Cir. 1997) ("[T]rial counsel's duty of effective assistance includes the responsibility to advise the defendant concerning the exercise of this constitutional right…. Although counsel should always advise the defendant about the benefits and hazards of testifying and of not testifying, and may strongly advise the course that counsel thinks best, counsel must inform the defendant that the ultimate decision whether to take the stand belongs to the defendant...").

Ordenes alleges that Elden never informed him of his right not to testify (and indeed, directed him to testify).  Elden, on his part, states that while he normally advises clients of their right not to testify, he cannot specifically remember if he discussed this issue with Ordenes.

Elden states that although he advised Ordenes to testify, given Ordenes' repeated protestations of innocence, he did, in fact, inform Ordenes that the choice was his.  Hrg. 107.  Even assuming *arguendo* that Elden did not properly fulfill his duty to inform him of his rights regarding testifying, Ordenes is still unable to prove prejudice.  The right of defendants not to testify was mentioned in open court on several occasions without any objection from Ordenes, undercutting Ordenes' averment that he would have taken a different course of action but for Elden's omission.  Additionally, several judicially authorized wiretap conversations were introduced at trial that Ordenes concedes were

"damning." <u>See</u> Gov't Mem. at 79; 1/29/06 Letter to Judge in Support of Petition for Habeas Corpus at 19.  Ordenes has failed to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.[30]

  B.  <u>Counsel's Alleged Failure to Adequately Prepare Ordenes for Trial</u>

Ordenes alleges that Elden did not meet with him a sufficient number of times, and did not spend an adequate amount of time preparing him to testify.  Both Ordenes and his wife assert that there was no "moot-court" prior to his taking the stand.  Ordenes Aff. ¶ 12; Hrg. 187-188.

Elden, however, contradicts Ordenes' allegations.  Elden testified that the two met at least five times in California, including at least once at the San Bernardino jail and several times in Elden's office before the wiretap motion was filed.  Further, Elden claims they met two or three times after the filing of the wiretap motion and two or three times a week during the trial.  Hrg. 78-79, 88-89, 91-92, 104-105.  Elden asserts that the two spent about fifteen to twenty hours preparing on Ordenes' testimony alone, including a "dry run."  <u>See</u> Elden Aff. ¶8; Hrg. 67.  Moreover, Elden testified that he offered to meet Ordenes on additional occasions before trial, but Ordenes rebuffed his attempts.  Hrg. 92; Elden Aff. ¶ 6.

Whether one agrees with the test or not, the law is clear: "[a] lack of effective assistance of counsel must be of such a kind as to shock the conscience of the Court and make the proceedings a farce and mockery of justice."  <u>Twitty v. Smith</u>, 614 F.2d 325, 333 (2d Cir. 1979), <u>quoting</u> <u>United States v. Wight</u>, 176 F.2d 376, 379 (2d Cir. 1949).  Based on Elden's testimony, Ordenes has not met his burden to demonstrate ineffective performance by Elden when he prepared for trial.  Even were Ordenes' testimony taken as true, to require a particular number of meetings between counsel and his client, absent anything more, would effectively impose the sort of "mechanical rule" governing counsel's behavior that the <u>Strickland</u> Court disfavored.  <u>See</u> <u>Strickland</u>, 466 U.S. at 641; <u>see also</u> <u>United States ex rel. Testamark v. Vincent</u>, 496 F.2d 641, 643 (2d Cir. 1974)

---

[30] Ordenes also claims that Elden did not tell him that if he chose to testify, the court could impose an obstruction of justice sentence enhancement upon him.  <u>See</u> 1/29/06 Letter to Judge in Support of Petition for Habeas Corpus, at 2-3.  However, this Court did not ultimately impose an obstruction of justice enhancement.  Ordenes' attempt to show "prejudice" in this fashion fails as a matter of law.

(infrequency of visitation with a client is not, by itself, enough to demonstrate ineffectiveness of counsel).[31]

Ordenes also asserts that the several sustained objections to Elden's direct examination of Ordenes, and the subsequent questioning of Ordenes by this Court, indicate ineffective performance.  I do not concur that Elden's questioning fell below objective standards of reasonableness.  Objections to form do not, by themselves, amount to constitutionally ineffective assistance of counsel.  <u>Cf</u>. <u>Byas v. Keane</u>, 1999 U.S. Dist. LEXIS 12315, at *13 (S.D.N.Y. 1999) ("Petitioner is not entitled to a perfect defense. He is entitled to reasonably effective assistance…"), <u>citing</u> <u>Wise v. Smith</u>, 735 F.2d 735, 739 (2d Cir. 1984).

Even taking the entirety of Ordenes' allegations as true, Ordenes does not demonstrate how any additional meetings with or preparation by Elden would have resulted in a different outcome.  <u>See</u> <u>Slevin v. United States</u>, 1999 U.S. Dist. LEXIS 11430, at *14 (S.D.N.Y. 1999) (because "[p]etitioner did not elaborate[] on how counsel's alleged general lack of preparation prejudiced the outcome of his trial," petitioner could not show "prejudice" under <u>Strickland</u>).

C.  <u>Counsel's Alleged Failure to Negotiate a Plea</u>

Defense attorneys have a constitutional duty to advise clients of plea offers, particularly when accepting the offer is in the defendant's best interests.   <u>Boria v. Keane</u> 99 F.3d 492, 497 (2d Cir. 1996).  However, this duty does not establish a *per se* rule that counsel must discuss with every client the costs and benefits of pleading guilty.  <u>Purdy v. United States</u>, 208 F.3d 41, 46 (2d Cir. 2000).  Instead, defense attorneys must consider various factors when rendering advice, including the defendant's chances of prevailing at trial; the likely disparity in sentencing after a full trial as compared to after a guilty plea; whether the defendant has maintained his innocence; and the defendant's comprehension of the various factors affecting his plea decision.  <u>Id</u>. at 45.

---

[31] Even assuming *arguendo* that Elden did not adequately prepare for trial, Ordenes has not adequately alleged how such alleged lack of preparation prejudiced the outcome of his trial.  <u>Cf</u>. <u>Slevin v. United States</u>, 1999 U.S. Dist. LEXIS 11430, at *14-15 (S.D.N.Y. 1999) (conclusory allegations that counsel evinced "a general lack of preparation" do not demonstrate prejudice).  Indeed, Ordenes' theory appears to be not that he would have prevailed at trial because of his innocence, but that Elden should have convinced him to plead guilty and negotiate a lesser sentence.

Here, it is undisputed that the Government never offered a plea.  Ordenes' claim, essentially, is that Elden should have pursued a plea despite Ordenes' continued protestations of his innocence.  Yet it is "objectively reasonable" that counsel in such circumstances might follow his client's wishes.  Indeed, in such circumstances, "a lawyer must take care not to coerce a client into either accepting or rejecting a plea offer."  See Khan v. United States, 2000 U.S. Dist. LEXIS 16965, at *21 (S.D.N.Y. 2000) (Baer, J.) (where petitioner "repeatedly maintained his innocence," decision to proceed to trial was not ineffective assistance), citing Purdy v. United States, 208 F.3d 41, 45.

Even if Ordenes could show ineffective performance, he cannot show "prejudice." To do so, he must show "objective evidence" beyond unsubstantiated, "self-serving, post-conviction testimony" that establishes a "reasonable probability" that were it not for counsel's failure to reasonably inform him of the possible consequences of going to trial, he would likely have opted to plead guilty.  Khan v. United States, 2000 U.S. Dist. LEXIS 16965, at *20 (citations omitted).  Ordenes avers that had the benefits of a negotiated plea agreement and cooperation been adequately explained to him, he would not, indeed, have proceeded to trial.  See Ordenes Aff. ¶14.  Yet Elden states that even after he explained the relevant law to Ordenes, and even after he suggested to Ordenes that he might consider pleading guilty considering the evidence against him, Ordenes still adamantly maintained his innocence.  Elden Aff. ¶13; Hrg. 49, 69, 94.  Based on Elden's credible testimony, Ordenes cannot make the requisite showing of prejudice here.

Moreover, Ordenes additionally cannot show prejudice because even had he pled guilty, the "reasonable probability of a different outcome" is slight.  The disparity between Ordenes' sentence following his guilty verdict at trial and that following a hypothetical guilty plea is relatively small. Ordenes received a sentence of 151 months, the lowest under the Guidelines for an offense level of 34.  The parties stipulated that the base offense level that the government would have used for plea negotiations would have been 34.  See 11/29/06 Letter to Judge in Support of Petition for Habeas Corpus at 15, n.2.  If Ordenes pled guilty, he would have received a three point reduction for acceptance of responsibility, corresponding to a Guidelines range of 120-135 months, or at most a reduction of two and a half years.  It is unlikely such a relatively modest

sentencing disparity could establish "prejudice" under <u>Strickland</u>.[32]  <u>See</u>

<u>Carbajal v. United States</u>, 2004 U.S. Dist. LEXIS 20350, at *14 (S.D.N.Y. 2004) ("The

difference a reduction of two years would make to a sentence of fifteen years is not

significant."); <u>compare</u> <u>Mask v. McGinnis</u>, 233 F.3d 132, 141-42 (2d Cir. 2000)

(difference between plea of less than 10 years and eventual sentence of 20 to 40 years can

establish prejudice).

    D.   <u>Counsel's Alleged Failure to Know Conspiracy Law ("Coercion" or "Duress"</u>
        <u>Defense)</u>

       Ordenes alleges that Elden particularly did not understand the law regarding

conspiracy, in that Elden specifically misinformed him that a defense of "coercion" or

"duress" was available.  <u>See</u> Ordenes Aff. ¶ 10.  Ordenes generally claims that had he

known that those defenses were not available to him, he would have plead guilty.

Ordenes Aff. ¶ 14.  Alternatively, it appears, Ordenes argues that Elden's conduct fell

---

[32] Ordenes claims, however, that had he pled guilty, the "safety valve" provision would have excused him from the 10-year mandatory minimum and potentially resulted in a lesser sentence.  <u>See</u> 11/29/06 Letter to Judge in Support of Petition for Habeas Corpus at 26.  Theoretically, if Ordenes had received the 2-point "safety valve" reduction, his base offense level would have been a 29, with an applicable sentence range of 87-108 months.  <u>See id.</u>  Ordenes, unsurprisingly, claims that Elden never explained the "safety valve" to him.  <u>See</u> Ordenes Aff. ¶10.

There is no reasonable certainty, however, that Ordenes would have attempted to qualify for the "safety valve" even had Elden negotiated a guilty plea for him. Notably, Ordenes did not attempt to qualify for the safety valve even after his new counsel explained the concept to him.  <u>See</u> Gov't Mem. 59.

Even had Ordenes attempted to qualify for the "safety valve," it is uncertain whether he would have met its requirements.  There are five "safety valve" requirements that must be met before one receives a reprieve from the mandatory minimum and the 2-point reduction.  <u>See</u> 18 U.S.C. 3553(f).

Ordenes would likely have met the first three requirements (i.e., that the defendant not have more than 1 criminal history point under the sentencing guidelines; that the defendant may not have used violence, threatened violence, or possessed a firearm or other weapon while committing the offense he is being sentence in conjunction with; and that the crime must not have caused death or serious bodily injury.)  <u>See</u> 18 U.S.C. 3553(f).

The government contends, however, that Ordenes would not have met the fourth requirements which are that the defendant did not organize or supervise others involved and was not involved in an ongoing criminal enterprise.  <u>See</u> 18 U.S.C. 3553(f); Gov't Mem. 55, 59-60.  Ordenes might have been found to have supervised others involved in the conspiracy.  It was alleged that Cleofas Vazquez worked for him as a truck driver in the conspiracy.  <u>See</u> Gov't Mem. 6-7, <u>citing</u> GX 41-53.  Additionally, had Ordenes attempted to meet the fifth requirement (i.e. that the defendant must provide the Government with full cooperation regarding information or evidence relating to the common scheme or plan), the government argues that it would have become clear that over 1,000 kilograms of cocaine was transported cross-country – thus raising Ordenes' drug exposure, and likely his base offense level.  <u>See</u> Gov't Mem. 59, 60; Tr. 756-58.

Accordingly, the potential availability of the "safety valve" does not sufficiently help Ordenes to meet his burden to show "prejudice" from his counsel's failure to negotiate a guilty plea.

below objective, professional norms owing to his alleged misunderstanding of the law and unsuccessful attempts to pursue a legally unavailable defense at trial.

As noted above, contrary to Ordenes' assertions, Elden attests that Ordenes repeatedly proclaimed his innocence and stated that he would not plead guilty to a crime which he had not committed.  Elden Aff. ¶¶ 3, 9.  As above, petitioner cannot show prejudice.  See Khan v. United States, 2000 U.S. Dist. LEXIS 16965, at *20.

Additionally, despite Ordenes' protestations,[33] Elden's strategic decision to pursue the defense of lack of intent to join the conspiracy does not constitute ineffective assistance of counsel.  Elden states that he attempted to negate the intent element of the conspiracy charge, as he viewed that as the "only defense that we had."[34]  Hrg. 96-97.  To that end, Elden submitted two jury instructions, both of which included language that required "willful" intent to participate in the conspiracy in order to find the defendant guilty.  That the Court did not accept the instructions does not, by itself, indicate that Elden's was an objectively unreasonable course of action.  Actions or omissions by counsel that "might be considered sound trial strategy" do not constitute ineffective assistance.  Strickland, 466 U.S. 668, 689.  Given the circumstances – here, his client's repeated protestations that he was innocent and his decision to go to trial, despite damning evidence against him and counsel's advice otherwise – Elden's strategy to negate the intent element of conspiracy as "the only defense he had" does not constitute ineffective assistance.  Even if it did, the evidence against Ordenes was such that it is hard to imagine that the eventual outcome would have been different.

Moreover, Elden's failure to research "coercion" or "duress" law does not constitute ineffective assistance, given Elden's (undoubtedly correct) evaluation that such

---

[33] "The trial transcript is replete with example after example to suggest that Counsel commenced this trial operating under the gross misconception that petitioner's fear would establish a viable defense to the charged conspiracy…this leads to the conclusion that petitioner doubtless decided to proceed to trial based upon Counsel's belief that his fear was a total defense to the charged conspiracy. Could Counsel have made such an enormous error?"  1/29/06 Letter to Judge in Support of Petition for Habeas Corpus, at 9.

[34] Essentially, Elden characterizes his defense as that "it was never [Ordenes'] intention… to intend to aid in the accomplishments of the unlawful act."  Hrg. 100-01; cf. United States v. Ceballos, 340 F.3d 115, 123-24 (2d Cir. 2003) ("the government must prove that [defendant] knew of the conspiracy and joined it, with the intent to commit the offenses that were its objectives, that is, with the affirmative intent to make the conspiracy succeed.") (internal citations omitted).  This defense is consistent with Elden's account of Ordenes' representations of innocence.  See note 18, supra.  Elden adverted to the fact that there "was not a strong likelihood of success using this defense."  Hrg. 101.  That said, Elden stated that he used it because he "couldn't get him to plead guilty."  Id.

an affirmative defense was impossible to mount at trial. Even decisions made after a less than complete investigation do not constitute ineffective assistance "so long as the known facts made it reasonable to believe that further investigation was unnecessary." Strickland, 466 U.S. 668, 690-691. And again, even had Elden extensively researched "coercion" or "duress" law, it is hard to imagine that the eventual outcome of the trial would have been different.

## IV. CONCLUSION

For the foregoing reasons, Ordenes' petition to vacate his sentence pursuant to pursuant to 28 U.S.C. § 2255 is DENIED.

The Clerk of the Court is directed to close this matter and remove it from my docket.

**SO ORDERED.**
**June ___, 2007**
**New York, New York**

U.S.D.J.

23